COURT OF APPEALS
DECISION
DATED AND FILED

June 24, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP176-CR**

Cir. Ct. No. 2020CF1099

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

OSMAN A. MIRZA,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Waukesha County: PAUL BUGENHAGEN, JR., Judge. *Affirmed*.

Before Neubauer, P.J., Gundrum, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Osman A. Mirza appeals the judgment convicting him of stalking and criminal trespass to a dwelling, both as acts of domestic abuse.

*See* WIS. STAT. §§ 940.32(2), 943.14(2), & 968.075(1)(a) (2023-24).[1]  For the reasons that follow, we affirm.

¶2      In August 2020, Mirza was charged with numerous crimes, including: stalking, battery, intimidation of a victim, disorderly conduct, criminal trespass, and false imprisonment—all relating to incidents involving Sally,[2] his estranged wife. Sally had petitioned for divorce in October 2019, and, according to the criminal complaint, Mirza thereafter not only frequently came to her residence without her knowledge or permission, but also battered her, coerced her to have sex with him, and threatened her family.

¶3      For example, in one incident, which occurred during a brief period in March 2020, when Sally and Mirza agreed to live together during the COVID-19 "Safer at Home" order, Mirza hit Sally and forced her to have sex with him without her consent.  During this incident, Sally called out to her Alexa device to call 911, but Mirza grabbed it and threw it against the wall.

¶4      During another series of incidents that occurred after Mirza moved back to his own residence, Mirza threatened, harassed, and battered Sally throughout the course of a day.  On that day, Mirza entered Sally's home without her consent.  Upon seeing her there with another man, Mirza exposed his genitals and said, "Let's tag team her, bro."  Sally told Mirza to leave, which he did, but he then sent her a stream of vulgar text messages.  Later that day, when Sally went to a friend's house, Mirza arrived there, too, and was told to leave after he called Sally derogatory names and flipped her over the back of the couch, causing her to land on

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Pursuant to WIS. STAT. RULE 809.86(4), we use a pseudonym instead of the victim's name.

her head and neck. Concerned for her safety, Sally asked her friend to drive by her house before she went home. Her friend saw Mirza's vehicle in Sally's driveway and the garage door open even though Sally had changed the garage door code.

¶5 Following those incidents, Mirza kept his and Sally's children from Sally for 18 days and demanded she have sex with him if she wanted them back. She initially acquiesced, but during the act changed her mind and wanted to leave. Mirza refused to let her go—pinning her down, threatening to break her arms, and throwing her phone out of reach. Sally was forced to stay until Mirza let her leave the next morning.

¶6 Later, when Sally blocked Mirza from all forms of communication and told him that the Family Wizard application was the only way she would communicate with him, Mirza circumvented this by using their son's phone. From their son's phone, Mirza sent degrading messages and photos of her and returned the phone to their son without deleting them.

¶7 When asked why she did not report these incidents to police when they occurred, Sally said she "wanted to just get the divorce over with" and did not want anything to slow it down. According to the complaint, forensic interviews with Mirza's and Sally's two children revealed that Mirza frequently said "mean stuff" about Sally and described inappropriate and violent things he was going to do to her. The children also revealed that Mirza had on other occasions driven by Sally's house, broken in, and stolen her mail.

¶8 In June 2020, Mirza called Sally's brother, who recorded the phone call. In the recording Mirza called Sally vulgar names and told her brother:

> You get a [] handle on your [] dumb sister because she is
> affecting my kids and at some point I am going to cut her

> throat in a way that's so [] SPECTACULAR that you …
> would think September 11th is a [] joke. That's how [] angry
> I am.... [I really want] to punch her to death[.]

(Brackets indicate where explicit language has been omitted.)

¶9      A month later, Mirza also contacted Sally's aunt and berated her for allowing Sally to seek a divorce.

¶10      Finally, in July 2020, Sally's home surveillance system captured video of Mirza walking around Sally's residence in the middle of the night and looking in the windows. Sally reported she felt "'uneasy and unsafe' in her own home" and was afraid that Mirza would harm her, especially after their youngest child informed her that Mirza concealed a firearm in his waistband whenever they exchanged custody.

¶11      Mirza initially pled not guilty to all charges and pretrial litigation began. As relevant here, Mirza moved to suppress the recording of the June 2020 phone call. The circuit court denied Mirza's motion to suppress, but withheld ruling on how much of the recording would be admitted, concluding that it would rule on admissibility as the evidence came in at trial.

¶12      The State offered a plea bargain under which Mirza would plead guilty to felony stalking as well as any Class A misdemeanor for which he had been charged. Mirza's trial counsel advised him to take the plea. Trial counsel, who had consulted with several other lawyers, was concerned about the phone recording and the impact it would have on Mirza's case.

¶13      Mirza—who was a criminal defense attorney himself—agreed to take the plea offer the Thursday night before trial was set to begin, but he changed his

mind early the next morning. That morning Mirza and trial counsel exchanged heated words, then cooled off, apologized, and resumed preparing exhibits together.

¶14 Then, around noon the Friday before trial, Mirza told trial counsel he had reconsidered and wanted to accept the plea. Trial counsel prepared the necessary forms and scheduled a plea hearing for later that afternoon, as the offer was set to expire at the end of the day. Mirza pled guilty to one count of stalking and one count of misdemeanor criminal trespass, and the circuit court went through the standard plea colloquy with him. The court set sentencing for about two months later.

¶15 Mirza subsequently hired new counsel and moved to withdraw his plea prior to sentencing, claiming that: (1) trial counsel coerced him into accepting the plea by yelling at him, and (2) he did not understand the plea. Following a hearing where Mirza and trial counsel both testified, the circuit court denied the motion, finding that Mirza knowingly, intelligently, and voluntarily entered his plea and that the plea was not coerced.

¶16 In finding that Mirza's plea was not coerced, the circuit court noted that the fact that an attorney yells at a client does not, by itself, automatically indicate coercion. In addition, the trial court found the timing of the argument and heated language significant:

> [T]his isn't a case where the attorney was yelling at Mr. Mirza in the conference room seconds before the hearing, swearing at him[.]… That conduct occurred, [but] it was clear that the parties had gone back to work to prepare for trial and Mr. Mirza made a decision after things had cooled. So I don't find that it was a coerced plea based upon that record.

5

¶17     The circuit court further determined that any confusion about the terms of the plea agreement that might have arisen on the Thursday evening before the hearing had been "ironed out" the next day. Also, the court found the fact that plea negotiations continued until almost the "last minute" did not constitute coercion. It noted that sometimes last-minute negotiations help a client get the best offer possible, even if the process is nerve-wracking.

¶18     In finding that Mirza did in fact understand the plea, the circuit court explained that, under the circumstances, Mirza's allegation that he did not understand the plea was simply not credible. The court explained that Mirza knew the elements of the offenses, not just because of the plea colloquy, but because of all the work he put in to assist his defense. Indeed, Mirza knew "the case better than anyone involved. Because, one, he lived the facts of it, and, two, he was very invested in looking at the case." The court further reasoned that while pleading was a difficult, personal decision to make, this particular plea was not complicated.

¶19     Later, following the United States Supreme Court's issuing *Counterman v. Colorado*, 600 U.S. 66 (2023), Mirza filed a second motion to withdraw his plea, claiming that *Counterman* rendered his conviction unconstitutional. The circuit court held another hearing and denied the motion. Mirza now appeals.

¶20     On appeal, Mirza argues that the circuit court erred in not permitting him to withdraw his plea before sentencing. He also argues that the *Counterman* decision renders his plea invalid.

¶21     While circuit courts "should freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reason, unless the prosecution will be substantially prejudiced[,]" *see State v. Jenkins*, 2007 WI 96, ¶28, 303 Wis. 2d 157,

736 N.W.2d 24 (citations omitted), "the decision to grant or deny 'the motion to withdraw the plea rests within the sound discretion of the circuit court[,]'" *id.*, ¶29 (citation omitted). In other words, we review a circuit court's "decision to grant or deny a motion to withdraw a plea before sentencing … under the erroneous exercise of discretion standard." *See id.*, ¶30. "All that 'this court need find to sustain a discretionary act is that the circuit court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.'" *Id.* (citation omitted). Only "[w]hen there are no issues of fact or credibility in play" does "the question whether the defendant has offered a fair and just reason become[] a question of law that we review de novo." *Id.*, ¶34. Put another way, whether a type of claim constitutes a fair and just reason is a question of law, while whether the reason given by a particular defendant actually exists is a question of fact we will not disturb unless the circuit court's findings were erroneous. *See id.*, ¶¶33-34.

¶22 In Mirza's case, the circuit court did not erroneously exercise its discretion in determining that Mirza did not present a fair and just reason to withdraw his plea. The court held a hearing at which Mirza and trial counsel both testified, and, in the well-reasoned oral ruling detailed above, explained why the facts did not support Mirza's claims that he was coerced and did not understand his plea. Because the circuit court examined the facts, applied the proper standard of law, and rationally reached a conclusion that a reasonable factfinder could reach, we will not disturb its findings. *See id.*, ¶¶30, 33-34.

¶23 Moreover, we decline to address the arguments Mirza raises for the first time on appeal. *See **State v. Hayes***, 2004 WI 80, ¶21, 273 Wis. 2d 1, 681 N.W.2d 203. In his brief, Mirza does not argue that his plea was coerced or that he did not understand his plea; rather, he "concede[s] the facts as the circuit court found

7

them" and instead argues that he should be allowed to withdraw his plea because he "had serious reservations about his attorney's ability and willingness to take the case to trial[.]" He further argues, without citation to the Record, that trial counsel "demonstrably got the most important evidence wrong."[3] These arguments are not only unpersuasive in their own right, but they also were not made before the circuit court; therefore, we will not consider them here. *See id.*

¶24 In addition, we conclude that the *Counterman* decision does not invalidate Mirza's plea. In *Counterman*, the defendant was convicted of stalking under a Colorado state statute after he sent hundreds of Facebook messages— including some that were "true threats"—to a local musician he had never met. *Counterman*, 600 U.S. at 70 (reciting background facts), 72 (defining and discussing the nature of "true threats"). The stalking statute under which Counterman was convicted did not require any mens rea. *See id.* at 72-73. Rather, the statute simply prohibited "[r]epeatedly ... mak[ing] any form of communication with another person in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person ... to suffer serious emotional distress[.]" *See id.* at 70 (first alteration in original; citation and subquotation marks omitted). So as not to chill protected speech, the Supreme Court held that to impose sanctions in a "true-threats" case, the State must additionally prove the defendant acted recklessly. *Id.* at 78-82. In other words, if liability is imposed due to the

---

[3] Though he does not specify exactly which evidence his trial attorney "got … wrong[,]" given the context of his argument, we assume Mirza is referring to a phone call between him and his then brother-in-law. As noted, the Record shows that the circuit court denied Mirza's motion to suppress the phone call. The Record also shows that, during one motion hearing, the district attorney told the court that it believed the court had ruled the entire call admissible. Unfortunately, any further ruling about the phone call beyond what was already discussed is not in the Record. Ostensibly because there was no explicit ruling admitting the entire call, Osman argues that trial counsel was wrong to infer that the call would pose a problem at trial. We disagree. Trial counsel consulted with numerous attorneys before concluding that the call was a problem, and, as far as the Record shows, damaging portions of it had the potential to be admitted at trial.

content of the defendant's speech, the State must prove that "a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *See id.* at 79 (citation omitted).

¶25     Mirza, focusing on the fact that the State intended to play his abusive phone call to Sally's brother at trial, argues that his conviction is invalid following *Counterman*. Given the nature of the phone call, Mirza argues it was a "true threat." Turning to the stalking statute under which he was convicted, WIS. STAT. § 940.32(2),[4] he further argues that because it requires only negligence, rather than the higher standard of recklessness now imposed by *Counterman* in "true threats" cases, the statute is no longer constitutional.

¶26     We disagree. Simply put, this is not a "true threats" case. Mirza overlooks the vast number of harassing and intimidating non-speech acts that formed the basis for his plea, including: driving by Sally's house, peering in her

---

[4] WIS. STAT. § 940.32(2) provides: Whoever meets all of the following criteria is guilty of a Class I felony:

> (a)   The actor intentionally engages in a course of conduct directed at a specific person that would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury to or the death of himself or herself or a member of his or her family or household.

> (b)   The actor *knows or should know* that at least one of the acts that constitute the course of conduct will cause the specific person to suffer serious emotional distress or place the specific person in reasonable fear of bodily injury to or the death of himself or herself or a member of his or her family or household.

> (c)   The actor's acts cause the specific person to suffer serious emotional distress or induce fear in the specific person of bodily injury to or the death of himself or herself or a member of his or her family or household.

(Emphasis added.)

windows late at night, entering her house uninvited (both when she was home and also breaking in when she was not home), and leaving explicit pictures of her on her son's phone—not to mention the physical and sexual violence he committed against her. The phone recording, damaging as it was, was not the sole basis for the stalking charge, but rather comprised one part of Mirza's ongoing course of conduct. While the call may have bolstered the victim's credibility and countered Mirza's defense claiming Sally was lying and/or misconstruing his actions, that call was but one piece of evidence. Because the plea hinged on Mirza's course of conduct, not the contents of the call, there is no First Amendment issue. Mirza's case is not a "true threats case," and, consequently, ***Counterman*** does not invalidate his plea.

  *By the Court.*—Judgment affirmed.

  This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.